## No. 25-1852

In the United States Court of Appeals
for the Sixth Circuit

# United States of America,

Plaintiff-Appellee,

v.

# Dovid Akiva Shenkman,

Defendant-Appellant.

On Appeal from the United States District Court
for the Eastern District of Michigan
No. 24-cr-20668 (Hon. Matthew F. Leitman)

## Brief for the United States

Jerome F. Gorgon Jr.
United States Attorney

Julie A. Beck
Assistant United States Attorney
Eastern District of Michigan
211 West Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9717
Julie.Beck@usdoj.gov

# Table of Contents

Table of Authorities...................................................................................... iii

Oral Argument Is Unnecessary .................................................................v

Issue Presented ...........................................................................................1

Statement of the Case .................................................................................2

A.    Shenkman brings child pornography into the United States. .......2

B.    Shenkman was charged with child pornography offenses
      and ultimately pleaded guilty..........................................................5

C.    The district court held an extensive sentencing hearing. ..............6

D.    Shenkman received a below-guideline sentence, and his
      ability to have contact with children on supervised release
      is restricted................................................................................... 12

Summary of the Argument .......................................................................17

Argument...................................................................................................19

Shenkman's below-guideline sentence and special condition of
      supervised release are procedurally and substantively
      reasonable.................................................................................... 19

      A.    Shenkman's procedural challenges fail under plain-error
            review. ................................................................................. 19

      B.    Shenkman's below-guideline sentence for serious child
            pornography crimes is not substantively unreasonable. .....25

      C.    The challenged special condition of supervised release should
            be upheld. ..........................................................................29

i

Conclusion ..................................................................................... 33

Relevant District Court Documents......................................................... 35

ii

## Table of Authorities

**Cases**

*Gall v. United States*, 552 U.S. 38 (2007) ........................................ 19, 25

*Puckett v. United States*, 556 U.S. 129 (2009) ................................. 20, 21

*Rita v. United States*, 551 U.S. 338 (2007) ............................................20

*United States v. Berridge,* 74 F.3d 113 (6th Cir.1996) ..........................32

*United States v. Conatser,* 514 F.3d 508 (6th Cir.2008)........................26

*United States v. Doyle*, 711 F.3d 729 (6th Cir. 2013) ........... 29, 31, 32, 33

*United States v. Ely*, 468 F.3d 399 (6th Cir. 2006)................................21

*United States v. Johns*, 65 F.4th 891 (6th Cir. 2023) ...........................21

*United States v. Madden*, 515 F.3d 601 (6th Cir. 2008) ........................20

*United States v. Poynter,* 495 F.3d 349 (6th Cir. 2007)........................28

*United States v. Rayyan*, 885 F.3d 436 (6th Cir. 2018) .............. 19, 25, 27

*United States v. Robinson*, 669 F.3d 767 (6th Cir. 2012) .......................26

*United States v. Thomas*, 933 F.3d 605 (6th Cir. 2019) ........................27

*United States v. West*, 962 F.3d 183 (6th Cir. 2020)..............................19

*United States v. Wright,* 991 F.3d 717 (6th Cir. 2021) .........................22

*United States v. Zobel*, 696 F.3d 558 (6th Cir. 2012)............................31

**Statutes**

18 U.S.C. § 3553(a)......................................................... 19, 26, 27, 28

**Other Authorities**

USSG § 5D1.2(b)(2) ............................................................................... 33

## Oral Argument Is Unnecessary

In this sentencing appeal, the issues raised are adequately presented in the briefs. Oral argument is not likely to assist the Court. Fed. R. App. P. 34(a)(2)(C).

## Issue Presented

The district court imposed a below-guideline sentence of 95 months in prison for Shenkman's crimes of transporting and possessing child pornography and a special condition of supervised release that prohibited him from living with or associating with children unless he obtains permission from his probation officer. Is Shenkman's sentence both procedurally and substantively reasonable?

## Statement of the Case

### A. Shenkman brings child pornography into the United States.

Dovid Akiva Shenkman was passing through the Ambassador Bridge Port of Entry from Canada to the United States when a Customs and Border Protection (CBP) Inspector referred him for a secondary inspection. (R.9: Amended Complaint, 16). Shenkman's name was flagged because of an investigation related to the distribution and receipt of child sexually abusive material (CSAM), which triggered the referral for a secondary inspection. (R.37: PSR, 276).

CBP officials and an HSI Special Agent conducted a border search of Shenkman's two cell phones. (R.1: Complaint, 3; R.37: PSR, 277). Shenkman said that he could not remember the password for his cell phones but unlocked them with his thumb print. (R.1: Complaint, 3; R.37: PSR, 277). The phones were placed in airplane mode, meaning that they were no longer connected to the internet and only files that were on the phone could be viewed. (R.37: PSR, 277).

Agents found and viewed the Telegram application—an encrypted social media application. (R.9: Amended Complaint, 17; R.37: PSR, 277). In one Telegram conversation, they saw exchanged videos of child

2

pornography, many including the vaginal penetration of prepubescent children. (R.9: Amended Complaint, 17–18). One video showed a prepubescent child licking an adult male's penis as it ejaculated. (R.9: Amended Complaint, 17–18; R.37: PSR, 277). Another video showed the same child being vaginally assaulted by an adult man. (R.9: Amended Complaint, 17–18; R.37: PSR, 278). Shenkman sent and received these videos. (R.9: Amended Complaint, 17–18; R.37: PSR, 278). In another Telegram conversation, there appeared to be dozens of video file exchanges, but the video files themselves were not available at the time. (R.37: PSR, 278). At one point in the conversation, Shenkman shared a video and then stated: "These two, I convinced her to do and now she is hooked, I just need to get her to make more videos." (R.40: Gov't Sent. Memo., 439; R.37: PSR, 278). The Telegram application and videos were on both phones. (R.37: PSR, 279).

Agents seized Shenkman's phones and obtained a search warrant. (R.37: PSR, 279). An SD card from one of the phones contained an Excel spreadsheet cataloguing Shenkman's usernames and passwords. (R.40: Gov't Sent. Memo., 440). A law enforcement request for information from the National Center for Missing and Exploited Children (NCMEC)

3

yielded CyberTips related to a username and email address found on Shenkman's spreadsheet. (R.37: PSR, 279). One tip from Kik showed that 10 suspected CSAM files—nine videos and one image—were uploaded in April 2021. (R.37: PSR, 279). The other tip from Snapchat showed that three suspected child pornography files were uploaded in July 2021. (R.40: Gov't Sent. Memo., 440; R.37: PSR, 279).

A partial extraction of one of Shenkman's phones revealed hundreds of images and videos of child pornography as well as graphic chats between Shenkman and others about the rape and exploitation of children. (R.37: PSR, 279). Many of the 312 images appeared to be thumbnail images of child pornography videos. (R.37: PSR, 279; R.47: Sent. Tr., 585). The images included sadomasochistic abuse, bondage, and sexual penetration of a toddler. (R.37: PSR, 279; R.40: Gov't Sent. Memo., 440–41; R.47: Sent. Tr., 585–86). Similarly, the 521 child pornography videos depicted the rape of infants and toddlers, a prepubescent child being forced to wear something resembling a collar with a leash extending from it, and a 19-second video of an adult male rubbing his penis against the mouth of an infant wrapped in a hospital blanket, wearing an apparent hospital wristband. (R.40: Gov't Sent.

4

Memo., 441; R.37: PSR, 279). His chats with users on another social media application were graphic, and in many, Shenkman claimed to have committed hands-on sexual abuse of children. (R.40: Gov't Sent. Memo., 441–44).

## B.    Shenkman was charged with child pornography offenses and ultimately pleaded guilty.

Shenkman was charged with distributing, receiving, and possessing child pornography. (R.1: Complaint, 1–6). An amended complaint charged him with transportation and possession of child pornography. (R.9: Amended Complaint, 14–19). He was ordered detained pending trial based on a finding by clear and convincing evidence that no conditions of release could reasonably "assure the safety of any other person or the community." (R.13: Detention Order, 24). To support this finding, the magistrate judge relied on the following:

- Shenkman's "relentless and longstanding sexual interest in children, including child pornography . . . involving rape, torture and infants, and in other sexually deviant practices (including bestiality);"

- his request for "even more messed up stuff" to sexually gratify himself;

- his use of multiple usernames on various electronic platforms;

- his transportation of child pornography on two different devices across an international border;

- his hosting of minors in his home but an inability or unwillingness to recall how often these minors visited or whether they were accompanied by adults; and

- his misrepresentation to pretrial services that there are no parks, daycare centers, or schools near his residence.

(R.13: Detention Order, 25). The magistrate judge concluded that Shenkman would not be able to "stay away from [child pornography] for any length of time, regardless of what conditions it imposes." (*Id.*).

The grand jury returned an indictment charging Shenkman with one count of transportation of child pornography and one count of possession of child pornography. (R.14: Indictment, 26–30). Shenkman pleaded guilty to both counts, without a plea agreement. (Docket Minute Entry, April 9, 2024; R.34: Plea Tr., 205).

## C.    The district court held an extensive sentencing hearing.

At sentencing, the district court found that the guideline range was 151 to 188 months; Shenkman did not object. (R.37: PSR, 287; R.47: Sent. Tr., 547–48). In fact, Shenkman agreed with the guideline range

in his briefing and on the record at sentencing. (R.38: Sent. Memo., 319; R.47: Sent. Tr., 547).

Initially, there was a dispute over assessing two points for Shenkman's use of a computer under USSG § 2G.2(b)(6). (R.47: Sent. Tr., 545; R.41: Objection to PSR, 453–54). Shenkman relied on a case from the Western District of Michigan, *United States v. Benedict*, 1:12-cr-145, in which the district court stated that, as a matter of policy, it did not include the additional two points for use of a computer because "it really seems to me to be improper to include something that is part of every one of these cases." (R.41: Objection to PSR, 453–54). The court disagreed with the reasoning in *Benedict*, relying on § 2G.2(b)(6)'s plain language: "He used a computer device, and so the scoring is correct." (R.47: Sent. Tr., 545). The district court added that "the Sixth Circuit doesn't necessarily share" the view in *Benedict* because "a computer image stays around longer than a noncomputer image," and the Sixth Circuit's authority "is obviously more persuasive." (*Id.*, 546–47). The district court offered to hear "any argument that you want to make about a variance." (*Id.*, 546–47). The court explained that whether a variance is warranted "on the basis that this somehow overstates his

7

culpability, that's the way I would pose the question, not as a scoring of the guidelines point." (R.47: Sent. Tr., 545). Defense counsel ultimately agreed that the two points were properly assessed, but he urged the court to vary downward. (*Id.*, 546).

The district court considered two expert reports that Shenkman submitted: one from Dr. Gavriel Fagin and the other from Dr. Gerald Shiener. (R.47: Sent. Tr., 550, 552). Dr. Fagin concluded that Shenkman was sexually abused as a child by a babysitter, which "could be seen as a mitigating factor in this offense," and "it seems highly likely that it contributed to his viewing of CSAM material." (*Id.*, 552*).* Dr. Shiener's report, however, contradicted the premise. (R.47: Sent. Tr., 552–53). When Dr. Shiener asked Shenkman whether he had been "stimulated by a babysitter when he was a small child," he responded that it was "not real" and that he was just "talking to somebody to get more stuff." (R.47: Sent. Tr., 552–53). The court found the contradiction significant: "It appears that on a potentially significant point, he may have perhaps said different things to the two experts. Doesn't that call into question the veracity of the other stuff he told the experts, that they are relying on?" (*Id.*, 554). Defense counsel attempted to reconcile the conflicting

8

accounts of childhood abuse, but the "best answer" he could offer was that Shenkman "is completely out of touch with his feelings" and is "doing his best right now." (*Id.*, 556–57).

The government was critical of Dr. Shiener's report. Shenkman admitted to Dr. Shiener that his sexual interest in children "has been there as long as he can remember." (*Id.*, 583; R.38: Shenkman Sent. Memo., 324). In the government's view, for Dr. Shiener to conclude that Shenkman is not a pedophile despite his admissions and without listing the characteristics of a pedophile was "disingenuous." (R.47: Sent. Tr., 583). The government also referred to a news article in which Dr. Shiener was quoted saying: "The sad part about sex offenders is that the recidivism rate is very high. . . . They are often not caught, but once they offend, they tend to re-offend." (*Id.*, 584). Thus, the government argued, his report should not be given as much weight. (*Id.*, 585).

Defense counsel urged the court to consider that Shenkman's religious community didn't know what he was doing "behind the green doors," but he should be credited with maintaining, "at least on the surface," a "productive life" and a commitment to "the obligations of his religion." (*Id.*). According to defense counsel, Shenkman's religious

9

advisors had "hit him over the head" and had already overseen the beginning of his "rehabilitation"—a "soul-searching inquiry into his guts, into the inner recesses of his soul," which he argued weighed in favor of a minimum sentence. (*Id.*, 570–71, 573).

The government argued that Shenkman, as evidenced by the expert reports, was not "the most reliable historian of his life." (*Id.*, 587–88). He also provided conflicting information to pretrial services and the probation department, saying, for example, that he did not volunteer in the community, but his brother said that Shenkman was "known for volunteering in the community." (*Id.*, 588). Shenkman said that he had minor children from the religious community to his home for meals, but he could not recall how often or whether they were accompanied by adults. (*Id.*; R.13: Detention Order, 25*)*. Shenkman also denied that he lives in the vicinity of a park, daycare center, or school, which again was disproved by his brother's statements to the contrary. (R.47: Sent. Tr., 588).

The district court explained that it views child pornography cases "on a spectrum" because "[t]hey are not all equally horrible." (*Id.*, 557). The most serious way to commit a child pornography offense, the court

10

said, would be "putting hands on the children" to create the child pornography and then transporting it. (*Id.*, 558). The court stated that a minimum sentence—what Shenkman requested—would only be appropriate for the "least serious version of this offense." (*Id.*, 558). Asked whether there was evidence that Shenkman had "actually put his hands on a kid," the government answered, "just his statements that he has." (R.47: Sent. Tr., 593).

The court also reviewed encrypted chat messages between Shenkman and others. (*Id.*). It balanced what it determined to be Shenkman "inducing people to do bad stuff" with the possibility that the messages were Shenkman "just throwing out fluff." (*Id.*, 558). But the court was concerned that the texts were "getting other people [with an interest in child pornography] revved up" by getting them "talking about this erotic experience that they each had." (*Id.*). This, the court said, put Shenkman's case higher up on the spectrum. (*Id.*). Shenkman responded that "most of what" he did was to "gain stature in this world," "get the thrill," and "somehow puncture this emptiness." (*Id.*, 560). Defense counsel added that, over time, Shenkman's pornographic consumption "created a greater need to see more, perhaps more things

11

that were perverse," to feed "the desire to somehow get a sense of something." (*Id.*, 560–61).

The government emphasized how troubling the chats were and that they discussed "the rape of babies and toddlers." (*Id.*, 585). In those chats, Shenkman "represented having done things to infants that are beyond the pale," and he even wanted to obtain "killing videos," referred to as "snuff." (*Id.*, 586). The government showed the court and defense counsel the "snuff" texts, explaining that much of this material—suffocation and sexual assault of children and infants, sexual assault of a corpse, and harm to a toddler and a baby—was "too graphic" to put in its sentencing memorandum. (*Id.*, 586–87). But there were still plenty of disturbing texts in its sentencing memorandum and in the PSR. (*Id.*, 586). The government argued that Shenkman looked at "graphic and horribly disturbing stuff," not merely to "feel something," but to obtain "additional sexual gratification." (*Id.*, 593–94).

**D.    Shenkman received a below-guideline sentence, and his ability to have contact with children on supervised release is restricted.**

The court went through all the § 3553(a) factors. (*Id.*, 594). It considered Shenkman's "longstanding interest" in children. (*Id.*, 596). "The stuff here . . . is among the worst of the worst; violence, there's

12

references in this stuff to animals. . . . really difficult stuff." (*Id.*, 595). The chats were "graphic" and "disturbing," "encouraging antisocial assaultive behavior," with the effect of "getting people revved up," which the court considered a "very serious matter." (R.47: Sent. Tr., 595–96).

The court also considered, that Shenkman, to his credit, led "a decent life" and was, "by all accounts," "an exemplary person" as described in "letter after letter from people." (*Id.*). The court recognized Shenkman's remorse as "genuine" and not just a response to getting "caught." (*Id.*, 597). Additional characteristics the court noted were his success as a "businessperson" and productivity in "the community," his religious devotion, and his "strong family support." (*Id.*, 597–98).

As for the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment, the court found that this factor "weighs in favor of a meaningful custodial sentence." (*Id.*, 598). As for specific deterrence, the court was convinced that nothing "near a guideline sentence" or a "super long sentence" was required. (*Id.*, 599). But for general deterrence, the court believed that "the message needs to go out loud and clear, with a serious sentence here, that . . . the price is high" for serious conduct like this. (*Id.*). The

13

court acknowledged the need to protect the community, but it found that Shenkman is unlikely to re-offend even though "[i]t's going to take a lot of work." (*Id.*, 599–600).

The court found that the need for educational or vocational training was less important here because Shenkman had "vocational training" and a "really significant skill." (*Id.*, 600). But it found that Shenkman needs "intensive sex offender treatment," which is available in prison, as well as "follow-up care on supervised release." (*Id.*).

The court considered the available sentences under the guidelines and focused on "avoiding unwarranted sentencing disparities amongst similarly-situated defendants." (*Id.*). Noting that avoiding disparities is "often achieved by imposing a within-guideline sentence," the court referenced statistical data tracking similarly situated defendants. (*Id.*). For offenders like Shenkman, the average sentence was 109 months and medial sentence was 97 months. (*Id.*, 601).

With all this in mind, the court concluded that Shenkman's request for a 60-month sentence was not high enough to achieve the goals of sentencing and that the government's request for a 180-month sentence was "greater than necessary." (*Id.*, 602). It instead imposed an

14

aggregate prison term of 95 months—60 months for the transportation count (the mandatory minimum) and 35 months, consecutive, on the possession count (a substantial downward variance)—followed by 10 years of supervised release. (R.43: Judgment, 465–67; R.47, Sentencing Tr., 602–03).

One special condition of supervised release prohibits Shenkman from providing care for children or living with children "without prior approval of the probation officer." (R.43: Judgment, 469; R.47: Sent. Tr., 606). Nor can he "have direct contact with any child [he] know[s] or reasonably should know to be under the age of 18, including [his] own children, without the permission of the probation officer." (R.43: Judgment, 469; R.47: Sent. Tr., 604).

The district court asked if the parties objected to the sentence. (*Id.*, 610, 612). Shenkman objected to payment of a $5,000 fine "forthwith," but nothing else. (*Id.*, 610). He asked to be released pending his designation to a facility so he could "observe the religious holidays with his family," which the court denied. (*Id.*, 612). At Shenkman's urging, defense counsel also requested that Shenkman be placed at "a religious facility," which the court explained it could recommend, but it

15

was up to the BOP where he was designated. (*Id.*, 614). The court again

asked if there were any other objections, but there were none. (*Id.*, 615).

This appeal followed. (R.44: Notice of Appeal, 473).

## Summary of the Argument

Shenkman transported and possessed child pornography when he traveled from Canada to the United States. He pleaded guilty and received a below-guidelines sentence. On appeal, he challenges the procedural and substantive reasonableness of his 95-month aggregate sentence and one special condition of supervised release. None are compelling.

Shenkman's sentence was not plainly erroneous as a procedural matter because the court calculated the guidelines correctly, considered the § 3553(a) factors, did not consider impermissible factors, did not rely on any clearly erroneous facts, and thoroughly explained why the sentence it imposed was not greater than necessary.

His 95-month sentence—well below the guideline range of 151–188 months—was also substantively reasonable and not an abuse of discretion. The district court offered sensible reasons for how it balanced the § 3553(a) factors and why it gave more weight to certain factors than to other factors.

As for the challenged special condition of supervised release, viewing the record as a whole, the court provided more than enough

17

justification for imposing it. The condition served the twin goals of supervision—rehabilitation of the defendant and protection of the public. Prohibiting Shenkman from having direct contact with any child or living with any child, including his own children, without the permission of his probation officer, is tied directly to his personal history and characteristics, the nature and circumstances of the offense, and the need to protect the public.

## Argument

**Shenkman's below-guideline sentence and special condition of supervised release are procedurally and substantively reasonable.**

### A.    Shenkman's procedural challenges fail under plain-error review.

"The first requirement of a legitimate criminal sentence is a process-driven one. The court must properly calculate the guidelines range, treat that range as advisory, consider the sentencing factors in 18 U.S.C. § 3553(a), refrain from considering impermissible factors, select the sentence on facts that are not clearly erroneous, and adequately explain why it chose the sentence." *United States v. Rayyan*, 885 F.3d 436, 440 (6th Cir. 2018) (relying on *Gall v. United States*, 552 U.S. 38, 51 (2007)).

Because Shenkman did not preserve any of his procedural claims, review is for plain error. *United States v. West*, 962 F.3d 183, 191 (6th Cir. 2020). To prevail, he must satisfy four prongs: (1) there must be an error or defect that has not been intentionally relinquished or abandoned; (2) the legal error must be clear or obvious, "rather than subject to reasonable dispute;" (3) the error must have affected the appellant's "substantial rights," which in the ordinary case means that

19

it "affected the outcome of the district court proceedings;" and (4) "if the above three prongs are satisfied, the court of appeals has the *discretion* to remedy the error—discretion which ought to be exercised only if the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Puckett v. United States*, 556 U.S. 129, 135 (2009) (cleaned up). Doing so is difficult, "as it should be." *Id.* Shenkman cannot satisfy even the first of these prongs, let alone all of them.

First, Shenkman claims that the district court failed to address three of his mitigation arguments: (1) the circumstances of his upbringing; (2) his mental health; and (3) his difficulties with intimacy. (Shenkman Br. at 19). But as even Shenkman acknowledges, the district court need only "set forth enough to satisfy the appellate court that [it] has considered the parties' arguments and has a reasoned basis for exercising [its] own legal decision-making authority." *Rita v. United States*, 551 U.S. 338, 356 (2007).

Here, the record as a whole—including a 90-page sentencing transcript—shows that Shenkman's mitigation arguments were considered. *See United States v. Madden*, 515 F.3d 601, 612 (6th Cir. 2008) ("Even if the court's explanation was imperfect, the record as a

20

whole shows that the court adequately considered Brown's mitigating arguments and provided a reasoned basis for the sentence that it imposed."). Indeed, the court referred to the "adverse childhood experiences" identified in Shenkman's sentencing memo and asked defense counsel to explain "why" those mitigation arguments "weigh in favor of a below-guideline sentence." (R.47: Sent. Tr., 550). The court had a narrow question about Shenkman's claim to have been sexually abused by a babysitter, given contradictory statements in the record, and defense counsel was unable to "answer that question yes or no." (R.47: Sent. Tr., 551–55). Given the court's efforts to obtain a satisfactory answer, the court was clearly giving deep thought to Shenkman's mitigation arguments. In the end, however, the court simply did not weigh those arguments as heavily as other factors, and that balancing "is simply beyond the scope of . . . appellate review." *United States v. Ely*, 468 F.3d 399, 404 (6th Cir. 2006).

Further, this Court has "never required district courts to engage in a formulaic point-by-point refutation of a defendant's mitigation arguments." *United States v. Johns*, 65 F.4th 891, 893–94 (6th Cir. 2023) (internal quotation marks omitted). This is especially true in

21

cases like this one, where "a defendant raises a bevy of mitigation arguments all falling under the general rubric of history and characteristics, which collectively may matter little when weighed against the reality of a serious federal offense." *Id.* (internal quotation marks omitted). Here, the disturbing nature and circumstances of Shenkman's offense loomed largest, and the court thoroughly explained why. *See United States v. Wright,* 991 F.3d 717, 719 (6th Cir. 2021) (explaining that courts can place great weight on a single factor when warranted). No more was required.

Next, Shenkman claims that the PSR incorrectly included a 2017 "arrest" for possession of child pornography. (Shenkman Br. at 24). But the explanation for why the information was included in the PSR was clearly articulated. It was also accurate. The information stemmed from HSI's identification of a Kik user called "loverlyyoungxxx," which was traced to an IP address associated with Shenkman. (R.37: PSR, 282–83). This is why Shenkman was flagged for additional inspection when he crossed the border from Canada into Detroit. (*Id.*). The information is listed under "Other Criminal Conduct" and makes clear that "no charges were filed." (*Id.*, 282). The criminal history section accurately

22

states that Shenkman has no adult criminal convictions, resulting in a score of "zero." (*Id.*).

Even if this information should not have been considered, the court did not commit reversible plain error. The information had no impact on Shenkman's guideline range because no criminal history points were assessed. Shenkman does not explain how this supposed error "affected the outcome of the district court proceedings," nor could he. And upholding his sentence would not seriously affect the fairness, integrity, or public reputation of judicial proceedings either.

And the court did not consider any impermissible factors. (Shenkman Br. at 21). While the court reviewed additional end-to-end encrypted chats, which the government described as too graphic for the public docket, it did not focus on those messages. (R.47: Sent. Tr., 586). There were plenty of graphic messages from Shenkman (keevman) included in the PSR and in the government's sentencing memorandum. (R.47: Sent. Tr., 559, 586, 595). The court's conclusion that the material being exchanged was "serious stuff" is amply supported:

> keevman:    i went to meeting for victims met a really
> cool chick we got drunk started hooking
> up and she brought her daughter into the
> mix and that was my first time

23

unnamed user:     Perfect
                  How old was she

keevman:          3

unnamed user:     Perfect
                  Did she scream?

                        * * *

keevman:          i was changing a diaper of a 6 month old
                  and couldn't resist so i rubed [sic] my
                  cock on her pussy and blew a huge load
                  took me a few min to reclean her up

                        * * *

keevman:          they don't know I was speaking to both of
                  you LOL
                  bags girlfriend daughter I used to do that
                  deep throat her until she stopped
                  breathing and passed out

                        * * *

keevman:          I told you I already made one pass out
                  from being gagged with my cock was a bit
                  frightening but I did blow a big load

                        * * *

keevman:          didn't need to a few dollars goes a long
                  way to a crackhead mother she even held
                  her down for me

unnamed user:     Nice
                  Did it scream?

24

keevman:              crackheads will do anything for a fix
                      little bit mother blew some crack at its
                      face so … it chilled out after that

                              * * *

keevman:              i like the brutal and forced stuff

(R.40: Gov't Sent. Memo., 442–444).

And even if the court considered the additional chat messages provided at the sentencing hearing, Shenkman cannot show that this changed the outcome of the sentencing. The additional messages, also summarized in the government's sentencing memorandum and the PSR, were more of the same graphic conversations already on the record, which the government cautioned that Shenkman may "like to keep private." (R.47: Sent. Tr., 587). The district court did not mention the additional chat messages again, and given the below-guidelines sentence, the record does not show that the court gave them any weight.

## B.  Shenkman's below-guideline sentence for serious child pornography crimes is not substantively unreasonable.

The substantive reasonableness of a sentence has to do with its length. *Rayyan*, 885 F.3d at 442. The issue is reviewed under a deferential abuse of discretion standard. *See Gall*, 552 U.S. at 41. A

25

sentence may be considered substantively unreasonable "when the district court selects a sentence arbitrarily, bases the sentence on impermissible factors, fails to consider relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent factor." *United States v. Robinson*, 669 F.3d 767, 774 (6th Cir. 2012) (quoting *United States v. Conatser*, 514 F.3d 508, 520 (6th Cir.2008)). While this Court "does not use any form of strict proportionality review, the greater the district court's variance, the more compelling the evidence must be." *Robinson*, 669 F.3d at 775 (cleaned up). Here, the district court did not vary upward or even go to the top of the guidelines range. Instead, it imposed a well-below-guidelines sentence—56 months below the low end of the guidelines range—and imposed only the mandatory minimum on the transportation count. The 35-month sentence on the possession count was consecutive to the mandatory minimum, but even so, the 95-month sentence is substantially lower than what the court could have imposed—151–188 months.

The district court painstakingly evaluated the § 3553(a) factors. (R.47: Sent. Tr., 594–601). The court's "spectrum analysis" allowed it to juxtapose Shenkman's serious conduct with his positive personal

26

characteristics. The court carefully detailed how the supervised release period—10 years, which was above the mandatory minimum of five years but far below the lifetime term available—would provide Shenkman an opportunity for therapy but also protect the public while he was on supervised release. The court called this a sentencing "package" that imposed "meaningful punishment" and a "lengthy term of supervision" to provide Shenkman "with support and to keep an eye on [him]," which the court considered an "appropriate way to balance out all of the competing interests here, under Section 3553(a)." (R.47: Sent. Tr., 602).

The core of Shenkman's substantive reasonableness challenge is that "the court placed too much weight on some of the §3553(a) factors and too little on others," the balancing of which "is a matter of reasoned discretion, not math." *Rayyan*, 885 F.3d at 442. This Court's "highly deferential review" of a district court's sentencing decision requires a defendant to "surmount a high bar" to succeed on a substantive-reasonableness challenge. *Id.*; *United States v. Thomas*, 933 F.3d 605, 613 (6th Cir. 2019). The thorough sentencing hearing here provides the "ring-side perspective" for this Court to conclude that the district court did

27

not abuse its discretion. *United States v. Poynter,* 495 F.3d 349, 351-352 (6th Cir. 2007).

As explained above, the court did not ignore Shenkman's mitigation arguments relating to personal history and characteristics. And it commented on several positive attributes, including Shenkman's "selflessness," "generosity," "helpfulness," "trustworthiness," and positive stature within his religious community. (R.47: Sent. Tr., 596). Setting aside his offense conduct, the court described Shenkman as "an exemplary person" who had success as a "businessperson." (*Id.*, 596–97).

Indeed, the district court's "spectrum approach" favored him, just not as much as he wanted. Shenkman simply did not like that the 35-month consecutive sentence on the possession count resulted in a 95-month sentence instead of the mandatory minimum 60-month sentence, which was the lowest sentence that the court could have imposed. But because the court did not consider impermissible factors and did not improperly balance the § 3553(a) factors, there was no abuse of discretion. Thus, his below-guideline sentence should be upheld as substantively reasonable as well.

## C. The challenged special condition of supervised release should be upheld.

Shenkman's last challenge relates to a special condition of supervised release, which Shenkman did not object to. (R.47: Sent. Tr., 613, 615). This challenge then is subject to plain error review. *United States v. Doyle*, 711 F.3d 729, 732 (6th Cir. 2013).

The challenged condition prohibits Shenkman from providing care or living in a residence "where children under the age of 18 also reside without prior approval of the probation officer." (R.43: Judgment, 469; R.47: Sent. Tr., 606). He is also prohibited from having "direct contact with any child [he] know[s] or reasonably should know to be under the age of 18, including [his] own children, without the permission of the probation officer." (R.43: Judgment, 469; R.47: Sent. Tr., 604). While the district court did not explicitly describe its rationale for imposition of this special condition, that rationale is fairly inferred from the detailed sentencing record.

This condition is specifically tied to Shenkman's personal history and characteristics, the seriousness of his offense conduct, and the danger posed to children and the public. Shenkman did not just possess child pornography—he transported it. He engaged in end-to-end

29

encrypted chat messages in which he claimed to have molested a three-year old. He sent and received hundreds of CSAM images and videos—all of them harming young children, even infants and toddlers—and described a desire for the "brutal and forced stuff." Shenkman himself told Dr. Shiener that he had been interested in graphic sexual material involving children for as long as he could remember. One of Shenkman's messages described his pride at having convinced a mom "to do [videos allowing her child to be raped and molested] and now she is hooked" and he needs to "convince her to do more." (R. 40: Gov't Sent. Memo., 439). As the magistrate judge reasoned in ordering Shenkman's detention at the outset of this case, it could not make a finding "in good faith" that he was not a danger to children and the community. (R.47: Sent. Tr., 612). And at sentencing, the district court noted that it will "take a lot of work to make sure [he's] not back in this stuff again." (R.47: Sent. Tr., 600). Shenkman was not surprised when the special condition was imposed—all the possible special conditions were included in the PSR, and he did not object to any of them. (R.37: PSR, 290–91, 295–97).

30

This case is nothing like *Doyle v. United States*, 711 F.3d 729 (6th Cir. 2013). There, a special condition that prohibited the defendant from having any contact with his own children went "too far" because Doyle's conviction was for failing to register as a sex offender. *Doyle*, 711 F.3d at 735. Shenkman does not have any biological children. And even if he did, his chat messages and predilection for CSAM involving young children and infants justifies this condition to, at a minimum, protect children and the community. *United States v. Zobel*, 696 F.3d 558, 574 (6th Cir. 2012).

It is true "that parents have a fundamental liberty interest in the custody of their own children." *Id.*, 696 F.3d at 574. But it is also true that courts have upheld special conditions restricting access to children when the safety of the community, especially children, is at stake and there is even a moderate risk of reoffending. *Id.*, 696 F.3d at 574–75 (listing cases). Those cases preclude reversal under plain-error review. *Id.*, 696 F.3d at 575.

The record here does not support an inference that the district court imposed more severe special conditions than necessary. The record is full of the court's concerns that Shenkman needed extensive

31

therapy, a meaningful sentence, and a supervised release term above the minimum. The court was understandably concerned that, absent serious oversight, Shenkman would remain a danger to children and to the public. To the extent the court failed to explicitly tie these concerns to the challenged special condition, that failure did not seriously affect the fairness, integrity, or public reputation of the judicial proceedings. *See Doyle*, 711 F.3d at 733–34, 736 (relying on *United States v. Berridge,* 74 F.3d 113, 119 (6th Cir.1996) (failure to explain why it imposed a special condition prohibiting the defendant from working in the banking industry was harmless where the condition related to rehabilitation and the protection of the public and this was "quite clear" from the record)). It is quite clear from the record why the district court imposed the special condition prohibiting Shenkman from contact with or living with children absent approval from the probation officer—the restriction assists him in avoiding circumstances that may lead him to consume graphic sexual material featuring children or engage in the type of hands-on conduct described in his encrypted chats.

This is not a case where a sentencing error led to "a more severe sentence" that diminished the integrity and public reputation of the

32

judicial system as well as diminished the fairness of the criminal sentencing system. *Doyle,* 711 F.3d at 736. The district court imposed a ten-year term of supervised release where there was a mandatory minimum term of five years and a guidelines range of five years to life. And the district court did not follow the policy statement in § 5D1.2(b)(2) which directs that, for a sex offense, "the statutory maximum term of supervised release is recommended." Instead, the district court acted consistently with its "spectrum" approach to impose a below-guideline sentence with tailored conditions of supervised release, all based on a fulsome record.

## Conclusion

Shenkman's sentence should be affirmed.

Respectfully submitted,

Jerome F. Gorgon Jr.
United States Attorney

/s/ Julie A. Beck
Julie A. Beck
Assistant United States Attorney
Eastern District of Michigan
211 West Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9717
Dated: March 23, 2026          julie.beck@usdoj.gov

33

## Certificate of Service

I certify that on March 23, 2026, I caused this Brief for the United States to be electronically filed with the Clerk of the United States Court of Appeals for the Sixth Circuit using the ECF system, which will send notification of the filing to the following attorney of record:

Matthew S. Kolodziejski, mattkolo15@gmail.com

/s/ Julie A. Beck
Assistant United States Attorney

34

## Relevant District Court Documents

The United States of America designates as relevant these documents in the district court's electronic record, Eastern District of Michigan case number 23-cr-20544:

| Record No. | Document Description | Page ID Range |
|---|---|---|
| 1 | Complaint | 1–6 |
| 6 | Temp. Detention Order | 11 |
| 9 | Amended Complaint | 14–19 |
| 13 | Detention Order | 23–25 |
| 14 | Indictment | 26–30 |
| 34 | Plea hearing transcript | 151–212 |
| 37 | PSR | 271–98 |
| 38 | Def. Sent. Memo. | 299–421 |
| 39 | Def. Amended Sent. Memo., Exhibit A | 422–36 |
| 40 | Gov't Sent. Memo. | 437–52 |
| 41 | Def. Sent. Memo. Addendum | 453–57 |
| 42 | Def. Sent. Memo. Index of Exhibits | 458–64 |
| 43 | Judgment | 465–72 |
| 44 | Notice of Appeal | 473 |
| 47 | Sent. Transcript | 528–617 |